UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INDIAN HARBOR INSURANCE COMPANY et al., Plaintiffs, -v- ALEXANDER MASHINSKY et al., Defendants. | 25-CV-3349 (JMF) <br> ORDER |

JESSE M. FURMAN, United States District Judge:

On June 26, 2026, the Court's Pro Se Office docketed a letter, with various exhibits, from Interpleader-Defendant Alexander Mashinsky. *See* ECF No. 191. Thereafter, the Court received a copy of the same letter, a copy of which is attached. The copy previously docketed appears to be incomplete — specifically, most of Exhibit C is missing. Accordingly, the parties should disregard the filing at ECF No. 191 and treat the attached as Mr. Mashinsky's submission.

The Clerk of Court is directed to mail a copy of this Order to Defendant Alexander Mashinsky.

SO ORDERED.

Dated: July 6, 2026
New York, New York

JESSE M. FURMAN
United States District Judge

June 2, 2026

Re Case #1:25-cv-03349-JMF Pro-Se filer

To: Honorable Judge Jesse M. Furman
USDC SDNY
500 Pearl St Room 2510
New York, NY 10007

Dear Judge Furman:

In response to the status hearing of June 1, 2026, I respectful petition the Court to amend my reply and submission as there are numerous issues of dispute which need to be addressed before any request of summary judgement could be awarded to the Defendants. These issues are as follows:

1. DEFENSE EXPENSES

The D&O insurance policy clearly defines "Defense Expenses" as "reasonable legal fees and expenses incurred in the defense or investigation of any claim. (II E - Definitions, Document 155-1 Page 43 of 92 att. as Exhibit A). The policy then goes onto state in Section III entitled "Exclusion" (Document 155-1 page 48 of 97 attached as Exhibit. B) that "Except for Defense Expenses the insurer shall not pay loss in connection with any claim brought about or contributed to in fact by any intentionally dishonest, fraudulent, or criminal act or omission or any willful violation of any of any statute, rule or law".

In this case, all submitted costs would be defined as "defense expenses" relating to 13 civil cases which came prior to any criminal charges leveled against me by the government. Based on the contractual language, these costs would legitimately fall within the policy's "Defense Expenses" category and not be excluded, they were already paid out by me and should be paid back in full. The non-applicable "Exclusion" section does not apply to the millions spent defending legitimate civil cases in relation to Celsius. My criminal case which proceeded these civil suits should not exclude me from coverage on any previously billed issues. To date no objections have been raised by the Defendants as to the validity of the "Defense Expenses" related to the 13 civil matters, ALL of which came prior to the government's criminal charges against me in late 2023.

2. EXCLUSIONS

Contrary to statements by the Defendants, the criminal case is a valid "Defense Expenses" as outlined under the policy (Section II (E)) and should also be immediately approved for payment. The key words in the policy's Exclusion Section III is "Except for Defense Expenses," the Insurer shall not pay loss in connection with any clam. This statement implies that all of my defense related expenses should be covered under the policy's implied language. The insurer has already acted on such interpretation when they distributed payments that included coverage for the criminal case.

The Defendants in this case, primarily Mr. Van Toll, seem to think that the policy only applies if I win the criminal matter or the entire policy is no longer in force. This is not what is written in the policy's language, nor is it the position the insurers themselves took when they decided to approve coverage for me on ALL civil and criminal matters. The same insurers who approved the 14 matters previously mentioned, have made several payments and distributions.

3. CRIMINAL SENTENCE IS NOT FINAL

I have recently (5/22/26) filed a Motion to Vacate, pursuant to 28 U.S.C. section 2255, (Attached as Exhibit C) with reference to my criminal case #23-CR-00347 (JSK). I have also filed a separate application for Pardon with the DOJ which is pending. Until the 2255 is adjudicated, the sentence relating to my case is not final. Any decision on expenses related to the criminal case and arguments concerning my claims for coverage rests on exclusions of non legal fees due to the status of the criminal case. The 2255 and pardon application counter the interpleading Defendants claims that the criminal sentence has been finalized. Since my 2255 has a likelihood of success considering the evidence presented, I respectfully request a stay in decisions related to my "Defense Expenses" in the criminal case but allow for my other legitimate defense expenses to be distributed.

I respectfully request that your honor read docket #189 in my criminal case which includes details relates to the civil actions pending in your court on the distribution of the D&O insurance proceeds. I am not able to attach the entire filing which is several hundred pages long since I do not have access to PACER. This is why I only attached the 9 most important pages showing the proof and standing I have to make my 2255 application successful. In my allocution on 5.8.2025 I only plead guilty to a single $53,000 sale of CEL tokens, which I neglected to disclose in my public statements. I also only plead guilty to a single misstatement related to "clarity from Regulators" relying on written confirmation from Mr. Pavon. The billion dollar fraud in Celsius has been perpetuated by Mr. Pavon, Leon and Treutler who are the same individuals standing in front of the court and asking for their legal bills to be paid.

To give the court a taste of the illegal activity (I quote from my 2255 on page 2): "...the illegal conspiracy by Pavon and Daniel Leon (Co-Founder and President) to do a hostile takeover of Celsius (Exhibit E1, Docket 189)...Leon agreed to split all his Celsius gains with Pavon (Exhibit E2, Docket 189) as an incentive, if Pavon removed Petitioner as CEO and took over Celsius. Together with Johannes Treutler, Yaron Shalem and Ron Sabo these 5 co-conspirators were at the center of the secret $200m CEL token price manipulation (Exhibit E3, Docket 189) between early 2021and December 2021".

I propose that in fairness to the volume of legal actions against me and the few matters each of the other defendants is facing a pro-rata basis be used for each of the 17 "Noticed Matter" (Document 155-1 Page 10-14) based on the total billings and number of defendants for each such case. The decision by the court to allocate the funds should be reached only after ALL parties had an opportunity to review and approve each others submissions.

REQUEST OF THE COURT

The above points list just a few of the reasons there is disagreement on facts and why the Interpleader defendants request for summary judgment should be denied.

I request the court to provide me with an opportunity to review the other defendants` submitted legal bills. The interpleader defendants all had an opportunity to review my bills submitted since 2022 and I should be provided the same limited discovery. While Mr. Van Tol and his interpleader defendants had ample time to get all the facts in this case I was excluded from the process and have not been provided access to any of the records due to my incarceration. I request an opportunity to review the other defendants submitted bills and expenses to make sure that the cases and fees billed are covered by the policy and calculate the pro-rata allocations each defendant should get for each of the 17 listed cases. I did not have an opportunity to review the extensive billing by the dozen different law firms and see if they were actually relevant and related to the 17 matters listed as "Noticed Matters". I have not seen a single legal bill submitted by the interpleader defendants as the interpleader defendants law firms neglected to copy me on a single document filed with the court.

A critical part of the dispute on the facts in this case are related to the Indian Harbor Insurance's confirmed approval of coverage for 14 of the 17 different "Noticed Matters" related to Alex Mashinsky (see document 155-1 Pages 10-14 attached Exhibit D ). Other defendants in this case only were sued from 1-7 matters 1 and so should not receive any coverage when the split of the proceeds is made for other matters where their clients are not even listed as defendants. The majority of the "Defense Expenses" paid by me were to the law firms of CWT, Yankwitt, Kasowitz and had nothing to do with the criminal case which came to be in the second half of 2023. The billings and invoices submitted were for 13 civil and one criminal action which included Goins, Plutus21, CFTC, Quebec AMF, OSC, Celsius Ch. 11, SEC, NYAG, Komarovsky, Bull, TX-AG, CA-AG, FTC, and other matters dating back to 2022. Mr Van Tol nor the other interpleaders have objected to any payments already made to me or are owed on any of these civil cases.

I suggest we separate all my submitted invoices for the criminal matter from the other civil matter and set aside an allocation for the only matter in dispute which needs to be resolved after my 2255 appeal and Pardon requests are finalized. The remaining funds for the remaining matters and defendants can be immediately allocated on a pro-rata basis among all the insured parties based on the matters they are part of without dispute.

Clearly Mr. Van Tol and other interpleaders are not presenting the totally of facts in this case. There is clear and ongoing dispute between the parties as to the extent of coverage of the policy and the meaning of its language. There is also a dispute as to what manner distributions should be made on. Mr. Van Tol is suggesting that his clients be paid an allocation for cases they are not even named on. This is the main issue in front of the court and I humbly ask your honor to resolve this dispute based on the law after the parties had an opportunity to brief after reviewing all relevant documents.

Since I do not have access to web sites or to PACER and there is a substantial delay in me getting notification by mail while in prison, I humbly request that you instruct Mr. Van Tol that they need to email me as well as mail me copies of any filing made in this case and that they need to come up with a schedule approved by the court. The system at Otisville does not allow to send

PDF or other attachments so documents need to be cut and pasted into the Truelinks system.

Thank you for your review and consideration of this request.

Respectfully,

Alex Mashinsky 68096510
Pro-Se filer
FCI Camp
P.O. Box 1000
Otisville, NY 10963

Exhibit A

# CORNERSTONE A-SIDE MANAGEMENT LIABILITY INSURANCE COVERAGE FORM

THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.

**In consideration of the payment of the premium, and in reliance on all statements made and information furnished to Executive Liability Underwriters, the Underwriting Manager for the Insurer identified on the Declarations Page (hereinafter, the "Insurer") including the Application and subject to all of the terms, conditions and limitations of all the provisions of this Policy, the Insurer, the Insured Persons and the Company agree as follows:**

## I. INSURING AGREEMENT

The Insurer will pay on behalf of the **Insured Persons Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Wrongful Act**, except to the extent that such **Loss** is paid by any other **Insurance Program** or as indemnification or advancement from any source. In the event that **Loss** is not paid by such other insurance or as indemnification or advancement, this Policy will respond on behalf of the **Insured Persons** as if it were primary, subject to all of its terms, conditions (including, but not limited to, CONDITION (B)) and limitations and without prejudice to the Insurer's excess position.

## II. DEFINITIONS

(A) "**Application**" means:

(1) the **Application** attached to and forming part of this Policy; and

(2) any materials submitted therewith, which shall be retained on file by the Insurer and shall be deemed to be physically attached to this Policy.

(B) "**Change In Control**" means:

(1) the merger or acquisition of the **Parent Company**, or of all or substantially all of its assets, by another entity such that the **Parent Company** is not the surviving entity;

(2) the acquisition by any person, entity, or affiliated group or persons or entities of the right to vote for, select, or appoint more than fifty percent (50%) of the directors of the **Parent Company**; or

(3) the court appointment of any person or entity with authority comparable to that of the **Insured Persons**, as defined in DEFINITION (I)(1), to liquidate or reorganize the **Parent Company**.

(C) "**Claim**" means:

(1) a written demand for monetary or non-monetary relief;

(2) any civil or criminal judicial proceeding in a court of law or equity, arbitration or other alternative dispute resolution; or

(3) a formal civil, criminal, administrative, or regulatory proceeding or formal investigation.

(D) "**Company**" means the **Parent Company** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or during the **Policy Period**, subject to CONDITION (C).

(E) "**Defense Expenses**" means reasonable legal fees and expenses incurred in the defense or investigation of any **Claim**. **Defense Expenses** will not include the **Company's** overhead expenses or any salaries, wages, fees, or benefits of its directors, officers, or employees.

(F) "**Employment Practices Claim**" means a **Claim** alleging an **Employment Practices Wrongful Act**.

Exhibit B

155

"Outside Entity" means any corporation or organization other than the Company of which any Insured Person, as defined in DEFINITION (I)(1), serves as a director, officer, trustee, regent, or governor, but only if such service is at the specific request of the Company.

(N) "Parent Company" means the entity named in ITEM 1 of the Declarations.

(O) "Policy Period" means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations or to any earlier cancellation date.

(P) "Subsidiary" means any entity during any time in which the Parent Company owns, directly or through one or more Subsidiary(ies), more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors.

(Q) "Wrongful Act" means:

(1) any actual or alleged act, error, or omission, misstatement, misleading statement, neglect, or breach of duty by any Insured Person, as defined in DEFINITION (I)(1), while acting in his or her capacity as a director, officer, general counsel, or member of the Board of Managers of the Company or a functionally equivalent role for the Parent Company or any Subsidiary operating or incorporated outside the United States;

(2) any matter asserted against an Insured Person solely by reason of his or her status as a director, officer, general counsel, or member of the Board of Managers of the Company;

(3) any Employment Practices Wrongful Act; and

(4) any Outside Capacity Wrongful Act.

## III. EXCLUSIONS

(A) Except for Defense Expenses, the Insurer shall not pay Loss in connection with any Claim:

(1) brought by or on behalf of, or at the direction of, the Company or, with respect to any Claim for an Outside Capacity Wrongful Act, an Outside Entity, except and to the extent such Claim:

(a) is brought and maintained by a security holder of the Company or such Outside Entity, but only if such security holder is acting independently of, and without the solicitation, assistance, participation or intervention of, the Company, any Insured Person, or any Outside Entity;

(b) is brought by the Bankruptcy Trustee or Examiner of the Company or such Outside Entity, or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the Company or such Outside Entity;

(c) is brought and maintained in a non-common law jurisdiction outside the United States of America or its territories or possessions; or

(d) is made after the Parent Company has undergone a Change of Control; or

(2) brought about or contributed to in fact by any:

(a) intentionally dishonest, fraudulent, or criminal act or omission or any willful violation of any statute, rule, or law; or

(b) profit or remuneration gained by any Insured Person to which such Insured Person is not legally entitled;

as determined by a final adjudication in the underlying action.

(B) The Insurer shall not be liable to make any payment for Loss in connection with any Claim:

Exhibit C Pages 1-11

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

ALEX MASHINSKY,
Petitioner

v. Case No. 23-cr-00347-JSK

UNITED STATES OF AMERICA
Respondent.

MOTION FOR HABEAS CORPUS RELIEF

NOW COMES, Alex Mashinsky, Petitioner, Pro Se, who respectfully submits this Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. 2255. This motion outlines deficiencies in representation provided by Attorney Marc Mukasey and the firm Mukasey & Young LLP which constitutes ineffective assistance of counsel in violation of the Sixth Amendment. The motion also further demonstrates how newly discovered evidence, obtained after the May 8, 2025 sentencing, combined with structural defects in the legal foundation of the charges of this case constitute a miscarriage of justice which has materially impacted the outcome of the Petitioner's sentencing. But for counsel's unprofessional errors, the result of the proceedings in this case would have been different. Strickland v. Washington, 466 U.S. 668, 687-96, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Petitioner requests the Court to schedule an evidentiary hearing to present bankruptcy recoveries, regulatory clarification, and the evidence which the Petitioner was prevented by his attorney from advancing to the Court. The arguments advanced herein are grounded directly in the court record, transcripts and rebuttal documents prepared by the Petitioner and provided to counsel, but never presented to the Court. This along with factual objections filed under 3553(a), Chapter 11 filings and all other previously disclosed material to counsel constitute clear error and an absolute conflict which must be addressed. These documents will prove that the Petitioner was deprived of the effective assistance of counsel guaranteed by the Constitution which resulted in an involuntary plea as outlined in Hill v. Lockhart, 474 U.S. 52 (1985); Laffer v. Cooper, 566 U.S. 156, 162, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012). The sentencing proceedings before the Court rested upon concessions and omissions that counsel made under financial duress and not in the interest of his client. The arguments for this claim are presented as follows.

I. INEFFECTIVE ASSISTANCE OF COUNSEL

A. Financial Duress

The root of counsel's deficiencies lay in the undisclosed financial distress of the firm Mukasey & Young LLP. This distress created a conflict of interest that permeated every strategic decision made by counsel since the outset of the Petitioner's representation. Throughout the proceedings, the firm faced profound operational instabilities which were never disclosed to the Petitioner, including named partner departure, mounting financial pressures and the ultimate closure of the firm shortly after the Petitioner's sentencing. (A1) Instead of preparing a vigorous defense or engaging in negotiations with DOJ, counsel prioritized a rapid resolution. Once Petitioner could no longer pay his legal bills counsel moved to avoid the time and expense of a 6 week trial or a Fatico hearing. Counsel's financial desperation is most evident by his unethical and secret effort to secure a conflicting client, FTX's Sam Bankman-Fried (SBF) without informing the Petitioner.

Mukasey & Young engaged SBF as a client in or around January of 2024. This representation created an absolute and unwaivable conflict since it was market manipulation of the CEL token and StETH by SBF while CEO of FTX, in mid 2022 that created significant harm to Celsius and its customers and which ultimately forced Celsius to pause withdrawals. Mukasey knew Celsius and the Petitioner each held a $2 billion dollar claims against FTX (A2) arising directly from SBF market manipulation. Celsius's claims arose from FTX's false indication that SBF wanted to secretly buy Celsius and migrate its customers without the knowledge of Petitioner, Celsius's controlling shareholder. Instead, SBF and Caroline Allison attacked the CEL token by creating over 15m fake CEL tokens on the FTX exchange (A3) which then were sold short, crushing the price of CEL by 80%, (A4) causing a "bank run" on Celsius. All this was communicated to Mukasey prior to his secret pursuit of FTX, but ignored. (Exhibits A1-4)

In a February 2024, a memo from the Department of Justice (B1) stated that Mukasey's engagement of SBF and FTX involvement with Celsius, "could cause him to have information that is relevant to the defense of Mashinsky, but that defense counsel is not authorized to share with Mashinsky." This immediate conflict was severe and impacted the Petitioner's defense, yet Mukasey, in an attempt to sustain his firm financially, pressured the Petitioner to waive the DOJ concerns so that the lucrative engagement with SBF could proceed. Mukasey told Petitioner that fees from SBF would help offset the mounting unpaid bills in the Petitioner's case. This put the Petitioner in an impossible situation where if he insisted that Mukasey drop SBF he would be left with an angry unpaid counsel in a criminal case, and if he waived the conflict, he would be left with a severe conflict and split legal representation. Neither option was a choice that should have been left to Petitioner. Petitioner did not know the extent of the fraud by FTX, Celsius Executives and Westcap when he waved this conflict.(B2) (Exhibits B1-2)

Mukasey believed that in addition to a $2 million dollar retainer from petitioner obtained in 2023, he would tap the $15 million dollar Director*s and Officer*s liability policy (D&O) held by Celsius which would pay for the ongoing retention fees. After being notified that the D&O policy (C1) would not cover legal fees, Mukasey pressured the Petitioner to secure additional funds. The Petitioner listed his house for sale, as well as borrowed from family and friends, but within months the retainer was quickly exhausted. Counsel contacted the Petitioner daily, demanding immediate wire transfers and harassing him with threats that additional funds must arrive or representation would cease. The firm's undisclosed financial pressures created an irreconcilable conflict between counsel's personal interests and his undivided loyalty to the Petitioner. Rather than advising the Petitioner candidly that the firm lacked the resources or willingness to proceed to trial, counsel urged acceptance of an unnegotiated government plea offer which appeared shortly after the retainer was exhausted. Counsel failed to advocate for the Petitioner on a single term of the 360 month plea agreement which Petitioner had 24 hours to sign. (C2) Mukasey told Petitioner he "could not win at trial" and that Petitioner should agree to the Government's 360 month plea offer stating explicitly, "I will not let this case bankrupt my firm." This statement laid bare that counsel was driven by self-preservation rather than by the Petitioner's best interest. (Exhibits C1-2)

B. Discovery and Investigation

Mukasey's conflict manifested in counsel's grossly ineffective discovery practices. Instead of focusing on the 1500 documents identified by Petitioner in an 868 page rebuttal document, (D1) counsel opted for a manual review of every email Petitioner wrote since 2017. This wasteful approach consumed the Petitioner's limited funds, creating excessive billable hours without materially advancing the defense. Counsel's focus was on generating fees rather than achieving a favorable outcome. Counsel failed to obtain discovery materials from Celsius and from Latham & Watkins (L&W), Celsius' regulatory counsel, despite being informed of a waiver of privilege (D2) arising from the sharing of legal memos by Celsius with FTX. These priviliged letters provided to FTX during May & June of 2022 due diligence process prove how Petitioner was excluded from L&W interactions and did not knowingly make false statements as claimed by the prosecution. SDNY_01_03599235 & 00102802. Petitioner relied on internal counsel Roni Pavon, who lied to Petitioner in 2020 & 2021 that Celsius was "fully compliant with all financial regulations", (D3) Petitioner was "cleared on an individual level (by the SEC)" (D4) and that Pavon "reached agreement with regulators". (D5) (Exhibits D1-5)

Mukasey did not investigate the illegal conspiracy by Pavon and Daniel Leon (Co-Founder & President) to do a hostile takeover of Celsius. (E1) Petitioner provided counsel documentation showing that Leon agreed to split all his Celsius gains with Pavon, (E2) as an incentive, if Pavon removed Petitioner as CEO and took over Celsius. Together with Johannes Treutler, Yaron Shalem and Ron Sabo these 5 co-conspirators were at the center of the secret $200m CEL token price manipulation (E3) between early 2021 and December of 2021. Purchases made via a secret FTX CnC account not used for CEL SDNY_R1_01856928, through manipulation to raise CEL to $2, then to $4, & eventually to $8. (E4) (Exhibits E1-4)

Despite approval from the Court, counsel failed to depose Pavon and Leon. Pavon was exclusively in charge of all CEL token transactions and all regulatory interactions since 2020. (F1) Pavon left HFN (Celsius outside counsel), (F2) to join Celsius as CRO and head of legal in mid 2020 after conspiring with Leon to do a hostile takeover. (E1) In a WhatsApp message to Pavon on 4/12/22, Leon states that, "It is my dream that the SEC removes Alex." (F3) Pavon confessed to Leon "will use iterative and uncollateralized loans to remove Alex." SDNY_01_03425449 (Exhibits F1-3)

In 2021, the New Jersey AG (NJAG) requested a list of "uncollateralized loans," Pavon, trying to use this request to implicate Petitioner provided L&W Celsius's outside counsel and the NJAG a list of ten Celsius customers which he knew was false. (Exhibits G1) In a footnote of an L&W memo to the SEC, Pavon admitted that these loans were cross collateralized or had corporate guarantees (forms of collateral). (Exhibit H1). This footnote eliminated all such loans from the "uncollateralized" category and made all Petitioner statements that "Celsius does not offer uncollateralized loans" match L&W statements. (Exhibit I1) This continuous fraud by Pavon was at the root of the charges against the Petitioner. The materials produced and provided by Pavon to the NJAG, SEC, and later the DOJ & the Grand Jury became the "fruit of a poisonous tree" which led to the

Petitioner's indictment. Mukasey failed to show how Pavon continuously fed the Petitioner false information which became public through the Petitioner's interviews and statements. Pavon told Leon on 9/10/20, "Alex is just a face and nothing else, it's me (Pavon) and you (Leon)." (SDNY_01_03427189) and on 4/8/22 Pavon admitted he was "not sharing" critical information about the "hole" and the SEC. (I2) Pavon stated "I saved Alex"..."and Celsius", referring to a short period in 3/22 when BTC price rose above $45k. (Exhibits K1)

Pavon's message on 9/28/21 to Yaron Shalem, (CFO) which stated, "he needed a different set of numbers for Alex" SDNY_01_00955931, Pavon manipulated financials to keep Petitioner in the dark about CEL buys. Others wanted to know why Celsius's CEO was receiving different financial reports than other Celsius executives. SDNY_01_03377147 (K2) Leon felt no duty to follow his CEO and controlling shareholder instructions, stating in a message to Pavon on 11/12/20, "I do what I want, Alex can go fuck himself". (K3) Pavon version was "At any point in my life, have I given you the impression that I play by the rules?". (L1) Leon demonstrated his commitment to Pavon by writing, "I will kill for you...we will get rid of Alex" 03425983 (N1) Pavon started to "restrict Alex from decisions" at Celsius. 03425763 (Exhibits O)

The Petitioner instructed Pavon on 9/4/21 to "protect against a decrease (of BTC price) in early 2021". Pavon and L&W met with the SEC on 9/24/21 to discuss settlement and the removal of the Petitioner from Celsius due to "false statements" related to loans and clarity from regulators. On 10.21.21, Pavon wrote to Leon stating, "Alex is not managing the company day to day, we will reduce his direct reports." 03425465 (Exhibit P) That same day Pavon removed the Petitioner as a voting member of the company's Risk 00085871 and Asset and Liabilities Committees, without informing Petitioner that he was no longer a voting member. (Exhibit Q) Petitioner's instructions as CEO no longer carried weight. When the Petitioner was removed from deciding on loans, asset deployment and risk, Celsius had a positive balance sheet with over $2 billion, strong enough to attract a $700 million equity investment from Westcap and CDPQ in 12/3/2021. (Exhibits R)

4

Counsel failed to utilize the evidence provided by Petitioner which showed that Pavon secretly assumed the day to day control of Celsius. On 2.4.2021, after being appointed as officer of Celsius Network LTD by Leon. SDNY_01_03426686 Pavon told Leon that he has talked to Celsius's lead investor (Westcap) and that they will tell the Petitioner "to step aside." 03425937 On 9/28/21 Pavon admitted to his co-conspirators that Westcap knew "we are supporting the currency (CEL)" (Exhibit S) On October 24, 2021, Pavon wrote to Leon, "They (Westcap) know Alex does not manage the company." 03425465 (Exhibit T) Pavon on October 28, 2021 writes to Leon stating, "The call (with Westcap) will decide if you (Leon) are a billionaire or (going to) jail." (Exhibit U) These private WhatsApp messages confirm Pavon and Leon planned and executed their fraudulent conspiracy to provide false information to the Petitioner and entrap him, thus baiting the SEC to remove the Petitioner as a controlling shareholder due to "misstatements". This fraud by Pavon and Leon started before Pavon joined Celsius in mid 2020. On the day Celsius closed the $700 million dollar capital raise (12/3/2021) with it's lead investor, Westcap, Pavon wrote the Petitioner to say, "Congratulations Mr. Mashinsky, you really built something amazing." 00485590 Pavon had no problem lying to everyone around him in order to achieve his goal of owning 50% of the fast growing company by any means necessary. (Exhibits V)

Sunada

Pavon's manipulation committing fraud on federal regulators and Celsius's clients never stopped. In a messages between Pavon and Rodney Sunada-Wong, Celsius's head of risk. After Pavon and Wong were secretly editing the Petitioner's public statements on YouTube for over a year as part of the plan to implicate the Petitioner in making "false public statements", Pavon and Wong emailed each other stating, "don't you think we should have Alex on this thread?" (Exhibit W), Pavon or Wong never added Petitioner to these critical emails. The long thread listed all "Ask Me Anything" (AMA) YouTube video edits which had been shared with other executives and employees of Celsius. The emails clearly show that the Petitioner was unaware and kept off any edits or decisions regarding edits of AMA content. The thread shows that the video edits were not motivated by an attempt to eliminate inaccuracies but created specifically to incriminate the Petitioner. These reports created by Pavon, Wong & Yarden Noy for L&W were to be shared with the SEC to remove Petitioner as CEO. Pavon and his lieutenants (all close friends of co-founder Daniel Leon) intentionally failed to provide the Petitioner with feedback on what he should say or not say in future AMA's while collecting evidence against him. Many of these individuals attended a weekly, hour long prep calls set up ahead of every AMA and intentionally withheld information about the edits they just did on previous videos. Counsel failed to explain to the court how the Petitioner had no intent to defraud or make misstatements regarding the company, but instead relied on people who were placed around him to provide him with what he thought was accurate information. (Exhibits X)

Counsel's failure to properly conduct pre-trial investigation for almost 2 years impacted the Petitioner and would have led to different results. Failure to interview or subpoena Pavon, Leon, Treutler, Wong or any other employee of Celsius could hardly be considered a strategic decision. See United States v. Debango 780 F. 2d 81, 85 (DC Cir. 1986); United States v. Gray, 878 F. 2d 702 (3rd Cir. 1989). This was a complete abdication of counsel's duty to investigate and falls completely below the minimum standards of reasonable professional representation outlined in Strickland. See English v. Romanowski, 602 F. 3d 714 (6th Cir. 2010). But for Mukusky's ineffectiveness in pre-trial investigation, the outcome of this case would have been different.

These deficiencies in counsel's performance did not occur in seclusion; they were compounded by Mukasey's failure to obtain access to the 3500 materials containing exculpatory evidence. Counsel's failure to obtain or fight for access to the no longer privileged communications between Celsius, (represented by L&W) and federal regulators clearly demonstrates how little he was willing to do for his client once he knew that payments would not be forthcoming from the Petitioner which he needed to bail out his firm. Despite repeated requests by the Petitioner, counsel failed to obtain any of these materials. When the plea offer arrived, on a Friday afternoon, Mukasey steered the Petitioner, who was now on Xanax and away with his family (with no computer access), to drive back to NYC on Sunday and pressured him to accept a 360 month non-negotiable plea offer within 24 hours. (Exhibit Y) Petitioner informed counsel that he desired a face to face proffer session with the DOJ prosecutors to refute the false narrative provided by Pavon, yet Attorney Mukasey refused and instead told the DOJ that Petitioner had no interest in a Fatico. The Petitioner spent two years preparing the 868 page rebuttal document detailing responses to all of DOJ's claims listed the Petitioner many attempts to derisk Celsius including the closing of $2.5B in overcollateralized FTX loans and demanding Celsius stay a net seller of CEL tokens in 2020 and 2021 (Exhibit Z), but counsel ignored this document when he learned that the D&O claims would not be paid in time to save his firm. Had counsel reviewed this document, he would have seen the detailed defense the Petitioner had prepared showing prudent risk management and the true reasons for the withdrawal pause and bankruptcy of Celsius in 2022. The basis for the $2B manipulation claim against FTX and the absence of any intent to defraud by the Petitioner. Withholding these critical defenses from the Court deprived the Petitioner of the ability to contest the government's false allegations effectively and emphasizes counsel's ineffectiveness to mount any meaningful defense on behalf of Petitioner. (Exhibits AA) See Johnson v. Urbine, 682 F. 3d 1223 (9th Cir. 2012) stating a defendant has a

Sixth Amendment right to effective assistance of counsel at all stages of the criminal proceedings which includes the entry of a guilty plea,

C. Sentencing and Loss Calculation

The Supreme Court has time and again emphasized the impact that the Sentencing Guideline range should have on a district court's determination of a defendant's sentence. The Guidelines central role in sentencing means that an error related to the Guidelines can be a significant procedural error. See Gail v. United States, 552 U.S. 38, 128 S. Ct. 586, 169 L. Ed. 2d 455 (2007).

In this case, the majority of the government's sentencing recommendation was based on a 30-point enhancement which was related to a supposed $550 million creditor loss by Celsius prior to bankruptcy. (Exhibit AB) The government framed the "loss" as funds "creditors lost access to" coming from imaginary uncollateralized loans but failed to show any documentation for a single institutional loan default due to these supposed "uncollateralized loans". The government is ignoring the Petitioner's actions and decision to be one of the first to voluntarily pause withdrawals which closed all counterparty loans before the contagion in the crypto market spread wide, Celsius only had $93m worth of collateralized institutional loans (zero uncollateralized loans) days before it filed for ch11 on 7/13/22. This critical decision to pause and close loans together with the Petitioner's insistence that distributions must be made in coin are the main reasons that led to Celsius being able to distribute over $4.73B to date. Petitioner terminated Akin Gump and appointed Kirkland based on their promise to distribute assets in Bitcoin and Ethereum. This large payout amount, exceeds the total amount of valid claims by Celsius's creditors. (Exhibit AC) DOJ's false assertion of losses, intended to achieve the maximum sentence for the Petitioner, could not be derived from bad loans or CEL token manipulation (both orchestrated by Pavon and Leon) as the losses from CEL and loans were much smaller than the $750m in equity funding Celsius has raised.

The government stated during sentencing that only 58% of claims were paid back to creditors as of the date of the hearing, but this percentage was wrong, without basis and intentionally misleading. The 58% which the DOJ claims is only achieved if one takes the original exaggerated Ch 11 $4.96B in claims and limits the payouts to the $2.87B issued prior to May 8, 2025. This math excludes the $220 million Celsius held in coin and cash for a pending distribution to creditors and the $658 million in Ionic digital shares which were distributed to creditors shortly after the sentencing date. (Exhibit AD) The $4.96B total claim number was obviously inflated since Celsius already announced that it was reserving $500m against reimbursement totals for duplicate, false claims and settlements. These adjustments reduces the actual valid claim amount to about $4.5B and bring total distributions before sentencing to 76%. Since then distributions rose to $4.73B, exceeding total claims. Thus due to counsel's ineffectiveness, the government improperly calculated losses associated with this case, attributing full responsibility of the loss to Petitioner (instead of Pavon and Leon) which dramatically increased the Petitioner's sentence. This placed him in a higher guideline range and prejudiced his sentencing before the Court. (Exhibits AE)

Celsius's net claims from unsecured creditors are expected to further decrease below $4.2 billion since many counter claims with creditors are still pending. Open collection efforts include $300 million arbitration against EFH, $150 million trial against Fireblocks, $58m of Ionic shares and a $2 billion dollar claim against FTX. Even a partial settlement of these and other open claims would result in additional recoveries for all of Celsius's creditors. To date, the vast majority of Celcius's creditors have been made whole. The Petitioner was deprived from presenting many of these facts during his sentencing due to the ineffectiveness and the ongoing conflicts of his counsel. (Exhibits AF) There is a reasonable probability since objective evidence exists, a different outcome would have occurred if proper evidence and argument were provided to the court by the Petitioner's counsel at sentencing. See Mayo v. Henderson, 13 F. 3d 528, 534 (2d Cir. 1994); United States v. Bent, 654 F. App'x 11, 13 (2d Cir. 2016); Lee v. United States, 582 U.S. 357, 365-66, 137 S. Ct. 1958, 198 L. Ed. 2d 476 (2017).

As previously stated, counsel avoided conducting a Fatico evidentiary hearing by falsely telling the DOJ that Petitioner was "not seeking a Fatico." During the May 8, 2025 hearing Petitioner came prepared to argue that the loss was "uncollected funds" but a motion was already filed an admission of a $590m loss into the record without showing it to Petitioner. Counsel's dramatic change of heart shows his complete ineffectiveness. At no point before this hearing had counsel briefed the Petitioner that he was planning to abandon his core strategy and that the deep dive into the objections which consumed over $1 million in billable hours was to be discarded. While reviewing the plea, the Petitioner was led to believe that the 3553 and Fatico process, would be part of the government's agreement. Counsel never explained that accepting the plea would result in the Petitioner's inability to contest the government's loss calculations. Counsel simply informed the Court that "there is no dispute" regarding the government's facts, a complete denial which prejudiced the Petitioner and denied him the right to effective assistance. (Exhibits AG) See U.S. v. Frank, 230 F 3d 811 (5th Cir. 2000).

Had the Petitioner understood the full exposure of not having the government prove it's loss calculations (which contributed to 30 of his 43 point sentencing range) and the decades long sentence awaiting him due to the guidelines, he would have refused

to enter into the government's plea agreement. See United States v. Gordon, 156 F. 3d 376, 380 (2d Cir. 1998). The failure to not challenge the government's loss calculations was so detrimental to the Petitioner that it can not be accepted as a "strategic choice" by Attorney Mukasey and constitutes a clear instance of ineffectiveness. See United States v. Gray, 878 F. 2d 702 (3rd Cir. 1989). This unexpected, last minute change by counsel made the plea agreement involuntary since the advice he received from counsel was not within acceptable standards. See Yalincak v. United States, No. 08-CV-1453, 2011 U.S. Dist , LEXIS 80191, WL 2469722 (D. Conn. Sept. 28, 2011).

7

II. FRUIT OF A POSIONOUS TREE

Mukasey failed to advocate that the genesis of the investigation into Petitioner statements and actions is based on Celsius's token (CEL) being both a security and a commodity but this assumption is squarely untrue under current regulatory understanding (The Clarity Act and SEC/CFTC statements). Mukasey refused to use the legal opinions Petitioner relied on, spanning several years which all state that the CEL token was no longer a security after its initial launch. (Exhibit AH) The Securities and Exchange Commission (SEC) and the Commodities and Futures Trading Commission (CFTC) both now state that most tokens are not securities in contradiction to the Government's assertions in this case (Exhibit AI). The securities and commodities statutes underlying the counts against the Petitioner by the Prosecution are civil in nature and were NEVER before applied criminally in this context. On April 7, 2025, ahead of sentencing now Acting Attorney General Todd Blanche wrote a letter to all U.S. Attorney's expressly stating that any prosecution involving token classification questions should be suspended.

Mukasey failed to demonstrate how Petitioner followed verbal and written advice of counsel from Pavon, Davis Polk, Akin Gump, L&W and other top law firms, clearly demonstrating that the Petitioner thought he was operating within the law. From 2020 until the pause in mid 2022, Petitioner was provided false information, marginalized, removed from meetings and decision making by Pavon and Leon in advance of their anticipated April 2022 SEC settlement which was intended to permanently remove Petitioner from Celsius. (Exhibits AJ)

Within 6 month of the start of 2022, Celsius's equity went from being valued at over $3.5B by some of the best investors to zero, followed by the filing of a Chapter 11 bankruptcy. This turn of events was a direct result of the Petitioner being excluded from decision making process. The reckless actions by Pavon, Leon, Wong, Treutler and others which maintained a secret and huge directional long position on BTC allowed FTX to destabilize Celsius. This was in defiance of Petitioner's multiple instructions to derisk, deleverage and sell BTC. (Exhibits AK) This resulted in Celsius's failure to quickly adjust to the fastest rise in interest rates in American history and the war in Ukraine which caused BTC price to drop by 75% in the first few months of 2022. The secret bets placed by Pavon and Leon to "save Celsius" from severe market fluctuations caused the collapse of the company and forced a rapid liquidation of the collateral provided to put these long BTC positions in place. The Petitioner's counsel failed to explain ANY of this to the court or utilize this information to negotiate a more reasonable plea deal with the Prosecution. (Exhibits AL) The Petitioner came to the May 8, 2025 hearing expecting to do a Fatico on all these unresolved issues, but Attorney Mukasey falsely told the Government that the Petitioner did not want the hearing. (Exhibits AM) Counsel failed to properly explain to the Petitioner that accepting the government's plea offer would result in the waiver of any arguments before the court. See United States v. Otero, 502 F. 3d 331 (3rd Cir. 2007).

In it's settlement with Petitioner the Government (Federal Trade Commission) has assessed the total amount owed to creditors to be the same as the Ch11 filing at $4.72B. The Ch11 first distribution notice (page 12), put total claims at $4.96B with $500m of that being reserved for disputes and counter claims (reducing the amount due to $4.46B). As of the filing of this petition over $4.73B already has been paid out by the Celsius estate which exceeds both net total claims. Petitioner advised the Court during sentencing that the $550m loss claimed by the government was actually "uncollected funds". The fact that Petitioner own lawyers argued against him during the same May 8, hearing putting on the record an unsubstantiated $590m loss shows how incompetent and ineffective Mukasey was in representing Petitioner interest. (Exhibits AN)

The government presented a Celsius EXCO slide prepared by a junior Celsius employee from 2020 that listed 70% in "uncollateralized loans". This slide is FALSE as it miscatagorized deposits on the Bitfinex Exchange (A custodian affiliated with Tether) as being uncollateralized. All loans issued on Bitfinex were over-collateralized. Bitfinex only offers margin of up to 50% to borrowers of Celsius assets on it's exchange (Celsius had no losses from lending on exchanges). This simple falsehood is one of the pillars of the government "proof" that Petitioner "lied with intent to defraud". The CFO & CIO of Celsius, Harumi Thompson stated in an email to Petitioner on March 22, 2020 (same period as the slide) "We don't have any uncollateralized loans,.." (SDNY_R01_03363388). Here, clearly the Government did not do their homework and just continue to assert the false narrative fabricated by Pavon. The Government also claims that for the rest of 2020 at least 20% was also "uncollateralized", another falsehood relying on slides instead of actual loans, the 20% refers to the same over-collateralized loans on Bitfinex. The DOJ claims Petitioner was a reckless, risk taking executive, but the evidence shows the opposite. For example, on 3/18/22 after Celsius has issued over $2B of over-collateralized loans to Alameda backed by FTT tokens from FTX, Petitioner wrote a strong memo to the risk team asking to close down all loans to Celsius largest and most profitable customer. The fact that counsel failed to properly explain or resolve these and other falsehoods with the DOJ ahead of sentencing should be malpractice. The very reason that the Petitioner had over 100 unsolved open issues with the DOJ as late as April of 2025 (a

month prior to sentencing), was due to the complete ineffectiveness of counsel in digging for the truth or providing and amicably resolving factual truths with the government prosecutors. As a result of counsel's ineffectiveness in raising these concreate issues Petitioner was sentenced on false narrative and partial facts. (Exhibits AO)

Petitioner provided the court many other examples of him providing disclosure and explaining to AMA viewers that Celsius was not a bank, had a risk of default and urged users to sell their CEL tokens and diversify. These segments clearly show Petitioner was always trying to protect his community. (Exhibit AP) Actions taken by Pavon and others, in secret, in defiance of written instructions from the CEO can not be then used as "evidence" of fraudulent lies by petitioner. Another important example of Petitioner good faith and true intent was petitioner disclosure in a 12/10/21 AMA (video SDNY 00004782 & 4761 time stamp 00:17:50) of $421m in total purchases of CEL tokens in 2021 by Celsius. This number which Petitioner asked his team to prepare ahead of the weekly AMA included all forms of buying which the Government claims was a secret conspiracy involving Petitioner and Pavon. Clearly, Petitioner would not be publicly disclosing illegal activity to the tune of $421m, spanning several years if he had anything to do with it. Petitioner wanted his community to know how much Celsius has spent on rewards, buybacks, interest, OTC purchases and CEL burns in total. This disclosure flies in the face of the Government's conspiracy theory and leaves Pavon, Leon and Treutler as the sole owners of the CEL price manipulation. Petitioner has submitted ample evidence of his instructions to the co-conspirators to sell CEL token during the exact period they were secretly buying CEL.

On 4/9/22 Petitioner was invited to an interview on CNBC international during a Crypto event in Paris. The interview setup by Leon and his advisor David Keys was presented to Petitioner as an "opportunity for Celsius to communicate the launch of custody services". Custody wallets was one requirement the NJAG put in place for all existing customers as part of the expected state and federal settlement. Instead the reporter was focused on whether Celsius had any Un-collateralized loans (asking Petitioner questions provided by Leon and Keys) during the live CNBC interview, which Pavon and Leon were watching live from Israel, Pavon said "I have not met such a stupid person (Alex) in my life...he is quite a fool, I have not seen such a thing..." referring to how easily Petitioner fell into their trap to misstate facts on national TV. Leon then replied "Lets get on a call with him? (Alex in Paris) It will speed up his lack of understanding and help promote this..." referring to Pavon and Leon plan to use the CNBC interview to incriminate Petitioner during the upcoming SEC settlement and finally cause the removal of Petitioner as CEO. Pavon and Leon had no problem lying to regulators, government officials and DOJ investigators for greed and power. They manipulated media officials and presented Petitioner with false information. Counsel failed to communicate any of these critical issues to the DOJ or the court. (Exhibits AQ)

Even after the Celsius pause, after the CEO commanded everyone in the company to focus on collecting all assets for the benefit of creditors, Leon was busy moving $12m in CEL gains offshore SDNY_R01_03438660. On 6/14/22 Pavon messaged Rod Bolger (CFO) "Citi and FTX expect Alex to step down", (AR) Leon told Pavon "Alex should go to jail for 100 years" SDNY_01_03428677 and on 7.9.22 "He and his whore wife, they should both be removed from the planet" SDNY_01_03426412

The government's charges rested on improperly applied legal theories which deprived the Petitioner of due process in violation of the constitution's fifth amendment. Additionally, counsel should have raised these issues forcefully to the Court but did not. Since the actual distribution and recoveries to creditors now exceeds all dollar claims submitted in the Celsius Chapter 11 proceedings a reasonable probability exists that but for counsel's errors, the Petitioner would have insisted going to trial. See Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985).

## CONCLUSION

The cumulative effects of these violations are clear. Counsel operated under severe conflicts of interest, failed to provide constitutionally adequate advice, withheld critical filings and information, abandoned essential defenses without informing or consulting with his client, and neglected to advance fundamental constitutional arguments.

The plea was not knowing or voluntary, since counsel misinformed and misled the Petitioner at nearly every step in the plea agreement process. An attorney-client relationship is built primarily on TRUST. Not having any legal training, no prior criminal history and dealing with the immense stress of a federal indictment, the Petitioner placed considerable trust in his attorney. This trust was misplaced. Attorney Mukasey failed to perform basic duties which were necessary a proper defense and but for his unprofessional errors, the results of the proceeding would have been different. See Strickland at 698.

The sentencing record was materially inaccurate, and the outcome of the proceedings was inconsistent with other verdicts related to the same statue and how the law is now being interpreted by the courts. Newly discovered evidence now demonstrates that the loss figure central to the sentence was factually wrong and that most creditors suffered no permanent harm and may still earn substantial return on their original investment. Structural defects in the charges render the legal theory

upon which the conviction rests untenable under current law. Petitioner therefore respectfully requests in the interest of justice, that the Court grant an evidentiary hearing, to vacate the sentence, and order a de novo resentencing at which the full corrected record may be considered. Such relief will restore the integrity of the process and ensure a sentence consistent with constitutional requirements and the facts as they are now known.

Petitioner reserves the right to amend and edit this submission. Petitioner asks the prosecution to provide the Court copies of evidence listed by petitioner but not included in the attachments as counsel has refused to provide the Petitioner with a copy of all his records.

Respectfully summited on this 18th day of May, 2026.

Alex Mashinsky
Petitioner Pro Sé
68096-510
FCI Otisville Camp
Two mile road
Otisville NY 10963

CERTIFICATE OF SERVIÇE

I, Alex Mashinsky, certify that on May,18, 2026 a true and correct copy of the forgoing was sent, postage paid, to the following:

United States Attorney
500 Pearl St
New York NY 10036

Alex Mashinsky, Petitioner, Pro Se

10

Debtor's Name Celsius Network LLC Case No. 22-10964

## Part 1: Summary of Post-confirmation Transfers

| | Current Quarter | Total Since Effective Date |
|---|---|---|
| a. Total cash disbursements | $39,572,400 | $635,684,861 |
| b. Non-cash securities transferred | $0 | $658,770,760 |
| c. Other non-cash property transferred | $303,067,397 | $3,436,169,880 |
| d. Total transferred (a+b+c) | $342,639,797 | $4,730,625,501 |

## Part 2: Preconfirmation Professional Fees and Expenses

| | | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| a. | Professional fees & expenses (bankruptcy) incurred by or on behalf of the debtor *Aggregate Total* | | | $0 | $164,969,616 | $0 | $164,606,060 |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | A.M. Sacculło Legal, LLC | Other | $0 | $230,725 | $0 | $230,725 |
| | ii | Akin Gump Strauss Hauer & Fe | Co-Counsel | $0 | $16,098,697 | $0 | $16,098,697 |
| | iii | Alvarez & Marsal | Financial Professional | $0 | $24,793,360 | $0 | $24,793,360 |
| | iv | Centerview Partners | Financial Professional | $0 | $24,353,872 | $0 | $24,353,872 |
| | v | KE Andrews | Other | $0 | $75,000 | $0 | $75,000 |
| | vi | Kirkland & Ellis | Lead Counsel | $0 | $74,041,850 | $0 | $74,041,850 |
| | vii | Latham & Watkins | Special Counsel | $0 | $10,506,738 | $0 | $10,506,738 |
| | viii | RSM US LLP | Other | $0 | $1,279,378 | $0 | $918,322 |
| | ix | Sontchi, LLC | Other | $0 | $73,822 | $0 | $73,822 |
| | x | Stout | Other | $0 | $1,251,266 | $0 | $1,251,266 |
| | xi | Stretto | Other | $0 | $12,264,908 | $0 | $12,262,409 |
| | xii | | | | | | |
| | xiii | | | | | | |
| | xiv | | | | | | |
| | xv | | | | | | |
| | xvi | | | | | | |
| | xvii | | | | | | |
| | xviii | | | | | | |
| | xix | | | | | | |
| | xx | | | | | | |
| | xxi | | | | | | |
| | xxii | | | | | | |
| | xxiii | | | | | | |
| | xxiv | | | | | | |
| | xxv | | | | | | |
| | xxvi | | | | | | |
| | xxvii | | | | | | |
| | xxviii | | | | | | |
| | xxix | | | | | | |

Exhibit A

11

SUBJECT: GXD Labs and EquitiesFirst Announce Resolution of Claims Relating to Celsius Bankruptcy Estate
DATE: 05/22/2026 05:51:03 PM

MIAMI & INDIANAPOLIS--(BUSINESS WIRE)--Today, GXD Labs, a wholly-owned subsidiary of Atlas Grove Partners, and EquitiesFirst jointly announced a settlement of claims relating to loans made by EquitiesFirst to Celsius Network. The settlement, which includes $500 million in payments, resulted in the dismissal of both an adversary proceeding originally filed in September 2023, and a related arbitration.

"We are pleased to have reached a settlement with EquitiesFirst," said R Christian Wyatt, Co-Founder and Managing Partner, GXD Labs. "This bespoke, out-of-court resolution is an important milestone for Celsius's creditors and the bankruptcy estate, and a testament to the rigorous, strategic approach our firm brings to complex asset recovery."

"We appreciate the collaboration with GXD Labs to put this matter behind us," said Al Christy, Jr., Founder and Chief Executive Officer, EquitiesFirst. "EquitiesFirst looks forward to continuing to be a leading provider of progressive capital throughout the world just as we've done since the firm was founded 24 years ago."

GXD Labs managed the litigation against EquitiesFirst through the Blockchain Recovery Investment Consortium (BRIC), which was created in early 2023 to maximize recoveries in complex digital asset bankruptcies like Celsius. The BRIC was appointed Complex Asset Recovery Manager and Litigation Administrator by the Debtors and Unsecured Creditors' Committee in the Celsius Network bankruptcy in January 2024, following Celsius's exit from bankruptcy protection.

Exhibit D Pages 1-5 ①

by the Quota Share Endorsement; Ex. 3, Endorsement No. 1. The obligations of the Excess Side A Insurers are several and not joint and are limited to the extent of the individual $1,250,000 aggregate limit of liability of each of the Excess Side A Policies. Ex. 2, Section IV, as amended by the Quota Share Endorsement; Ex. 3, Endorsement No. 1.

### C. The Noticed Matters

33. The Interpleader-Defendants have tendered multiple matters to Interpleader-Plaintiffs for which they contend they are entitled to coverage under the Side A Policies (collectively, the "Noticed Matters"). The matters tendered to Interpleader-Plaintiffs to date include:

a. A lawsuit styled *Goines v. Celsius Network, LLC*, No. 2:22-CV-04560-KM-ESK (D.N.J.), a putative class action lawsuit filed on July 20, 2022 by purchasers of specified Celsius financial products through a Celsius Earn Rewards Account, the CEL Tokens and/or specified Celsius loans against, *inter alia*, Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, and Kristine Mashinsky;

b. An arbitration styled *Plutus21 Blockchain Opportunities Fund, I, L.P. v. Mashinsky*, instituted by Plutus21 Blockchain Opportunities Fund, I, L.P. and certain other Plutus21 entities against Alexander Mashinsky and Shlomi Daniel Leon;

c. The following subpoenas issued by the Commodities Futures Trading Commission ("CFTC"):

i. A subpoena issued to Celsius and its affiliates in the matter captioned *Re: Certain Trading Activities Involving TerraUSD (UST) / LUNA Digital*

ess Side

②

*Assets (No. B9486)* dated June 30, 2022;

ii. A subpoena issued to Celsius in the matter captioned *Certain Persons Engaged in Fraud and Other Unlawful Conduct with Respect to Digital Asset Transactions (C0352)* dated September 9, 2022;

iii. A subpoena for the production of documents issued to Alexander Mashinsky dated October 14, 2022;

d. A lawsuit styled *CFTC v. Celsius Network, LLC*, No. 1:23-cv-6008 (S.D.N.Y.), filed on July 13, 2023 by the CFTC against Celsius and Alexander Mashinsky;

e. An indictment in a proceeding styled *United States v. Mashinsky*, No. 23-cr-347 (S.D.N.Y.), filed on July 11, 2023 by the United States Attorney for the Southern District of New York against Alexander Mashinsky and Roni Cohen-Pavon;

f. The following letters sent by the Quebec Autorité des Marchés Financiers (AMF):

i. A letter sent by the Quebec AMF to Alexander Mashinsky captioned: *Re: Distribution and trading of securities in contravention of securities legislation Our file no: AU-DCT-3288-01/00* dated July 25, 2022;

ii. A letter sent by the Quebec AMF to Celsius dated August 31, 2022 requesting additional information concerning Celsius's ability to discontinue the Earn Service program in Canada;

g. A letter sent by the Ontario Securities Commission ("OSC") to Celsius dated July 27, 2022 stating that its records indicate Celsius may be soliciting Ontario

(3)

residents without registering with the OSC and seeking information regarding Celsius's activities in Ontario;

h. Certain matters relating to the bankruptcy proceeding styled *In re: Celsius Network LLC*, No. 22-10964 (Bankr. S.D.N.Y.) (the "Bankruptcy Proceeding"):

  i. A September 14, 2022 order by the United States Bankruptcy Court for the Southern District of New York granting a motion filed by the United States Trustee to appoint an examiner to conduct an examination concerning, *inter alia*, Celsius's cryptocurrency holdings;

  ii. Certain requests for discovery upon certain Interpleader-Defendants under Bankruptcy Rule 2004 or as identified in the Examiner's Report;

  iii. A motion for approval of a joint stipulation between Celsius and the Official Committee of Unsecured Creditors which included a proposed complaint asserting causes of action against, *inter alia*, Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Aliza Landes, and Kristine Meehan, filed on February 14, 2023 in the Bankruptcy Proceeding;

  iv. A June 18, 2022 demand letter to Shiran Kleiderman from White & Case LLP on behalf of Mohsin Y. Meghji, the Litigation Administrator for Post-Effective Date Debtors in the Bankruptcy Proceeding;

  v. An adversary proceeding styled *Meghji v. Mashinsky*, Adv. Proc. No. 1:24ap3667 (Bankr. S.D.N.Y.) (the "Adversary Proceeding"), commenced on July 10, 2024, naming as defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Harumi Urata-

(4)

Thompson, Jeremie Beaudry, Johannes Treutler, Aliza Landes, and Kristine Meehan Mashinsky;

i. The following letters from Celsius investors:

i. A letter sent by Bradley Hart to Celsius dated July 28, 2022 seeking $10,000 that he asserts he was unable to transfer to secure a marginalized loan that he acquired due to Celsius's freezing of his account;

ii. An undated letter sent by Erik-Jan Smulders to Celsius advising that he is owed $27,289.70;

j. The following subpoenas served by the Securities and Exchange Commission ("SEC"):

i. Deposition subpoenas served on Rod Bolger, dated January 10, 2023; on Rodney Sunada-Wong, dated January 23, 2023; and on Vice President of Treasury Jason Perman, dated January 25, 2023;

ii. A document subpoena served on Jason Perman dated January 23, 2023;

iii. A subpoena served on Shlomi Daniel Leon on October 11, 2022;

iv. A subpoena served on Alexander Mashinsky on July 25, 2022;

k. A lawsuit styled *SEC v. Celsius Network Limited*, No. 1:23-cv-6005 (S.D.N.Y.), filed on July 13, 2023 by the SEC against Celsius and Alexander Mashinsky;

l. A lawsuit styled *New York v. Mashinsky*, No. 450040/2023 (N.Y. Sup. Ct., N.Y. Cnty.), filed on January 5, 2023 by the Attorney General of the State of New York against Alexander Mashinsky;

m. A motion filed on December 9, 2022 by the plaintiff in the lawsuit styled

*Komarovskiy v. Celsius Networks LLC*, No. 2285CV00701 (Mass. Super. Ct.) to amend the complaint to add Alexander Mashinsky and Shlomi Daniel Leon as defendants, including a proposed amended complaint;

n. A lawsuit styled *Bull v. Mashinsky*, No. 1:23-cv-01327 (S.D.N.Y.) filed on February 16, 2023 by alleged Celsius investor, Thomas Bull, against Alexander Mashinsky and Kristine Mashinsky; and

o. Numerous investigations and proceedings by state attorneys general, state regulators, and United States Attorneys' offices;

p. The following matters involving the Federal Trade Commission ("FTC"):

i. A Civil Investigative Demand served by the FTC on Alexander Mashinsky on November 23, 2022;

ii. A letter and proposed consent order sent on June 6, 2023 by the FTC to Hanoch Goldstein and Kristine Meehan Mashinsky;

iii. A lawsuit styled *FTC v. Celsius Network, Inc.*, No. 1:23-cv-6009 (S.D.N.Y.), filed by the FTC against, *inter alia*, Alexander Mashinsky, Shlomi Daniel Leon, and Hanoch Goldstein on July 13, 2023; and

q. A July 13, 2023 letter from Celsius to counsel for Hanoch Goldstein stating that Celsius intends to move to equitably subordinate Mr. Goldstein's bankruptcy claims.

34. Interpleader-Plaintiffs have agreed to provide Defense Costs coverage in connection with certain of the Noticed Matters, subject to full reservations of rights of the Lead Side A, Berkley Excess Side A, and QBE Excess Side A Policies' terms, conditions, and exclusions.